## Holly Hill Holdings *v.* George D. Lowman et al.
### (10746)
### (11135)

Dupont, C. J., Lavery and Freedman, Js.

Argued October 1, 1992—decision released January 14, 1993

*Robert L. Trowbridge,* with whom, on the brief, was *Ronald W. Lindlauf, Jr.,* for the appellants (defendants).

*Harold B. Finn III,* with whom, on the brief, were *Donna Nelson Heller, Richard W. Painter* and *Jennifer B. Rubin,* for the appellee (plaintiff).

DUPONT, C. J. This is an action to foreclose a purchase money mortgage. The defendants pleaded several special defenses and counterclaims. The case was referred to an attorney trial referee who recommended foreclosure of the mortgage after first determining that the special defenses did not lie and that the counterclaims did not defeat the plaintiff's right to foreclosure. The trial court reviewed the findings and conclusions of the attorney trial referee and rendered a judgment

of strict foreclosure and a judgment for the plaintiff on the defendants' counterclaims.[1]

The principal issue of this appeal is whether a purported nondisclosure of environmental problems by the plaintiff to the defendants is a defense to a foreclosure action or can serve as a counterclaim for damages. We conclude that the defendants have failed to assert a valid defense to the foreclosure action, and that the plaintiff's failure to make certain disclosures to the state department of environmental protection (DEP), as required by § 22a-449 (d)-1 (f) of the Regulations of Connecticut State Agencies[2] concerning the non-residential underground storage of oil and petroleum liquids (underground tank regulations), on the facts of this case, does not give rise to a private right of action that can be asserted by the defendants as a counter-claim for damages.[3] We therefore affirm the judgment of strict foreclosure and the judgment of the trial court on the defendants' counterclaim for damages.

Pursuant to paragraph thirteen of the purchase and sale agreement, the property itself was to be delivered,

[1] The promissory note and mortgage deed were originally executed by defendants Al Aydagul and George Lowman. At the time of the suit to foreclose the mortgage, defendant Klaus W. Beckmann and defendant Lowman were the title holders. By the time of the trial, defendant Beckmann alone was the title holder. The three defendants filed essentially identical special defenses and counterclaims.

[2] Section 22a-449 (d)-1 (f) (1) of the Regulations of Connecticut State Agencies, promulgated by the commissioner of environmental protection pursuant to authority granted by General Statutes § 22a-449 (d), provides in its entirety: "No owner or operator shall transfer ownership, possession or control of any new or existing facility without full disclosure to the transferee of the status of the facility with respect to compliance with these regulations at least fifteen (15) days prior to the transfer. Such disclosure shall include an up-to-date copy of the information submitted to the commissioner pursuant to subsection (d)."

[3] It is not disputed that a violation of General Statutes § 22a-134b could give rise to a private cause of action by a transferee against a transferor. See footnote 12, infra.

"as is."[4] Title to the property was conveyed subject to a prior mortgage from the plaintiff to Carmela DaPra, which the grantees assumed. The property was also conveyed subject to "[s]uch state of facts as a personal inspection and accurate, up-to-date survey would disclose."[5] The "as is" provision in the sales agreement did not appear in the warranty deed. Immediately after delivery of the warranty deed, Aydagul quitclaimed his interest in the property to the defendant Klaus Beckmann. Beckmann later executed an assumption agreement whereby he agreed to assume all of Aydagul's obligations and liabilities under the promissory note and mortgage.

The subject property consists of a house that had been converted into offices, a garage type building containing two repair bays, and an island on which gasoline pumps were previously situated. At the time of the original transfer of the property from the plaintiff to Aydagul and Lowman, the gasoline pumps had been removed. The evidence indicates that gasoline was last pumped on October 30, 1985, shortly before the plaintiff took title to the property, and almost eight months before the plaintiff conveyed title to Aydagul and Lowman.

On November 7, 1986, Lowman and Beckmann granted a mortgage in the property to the Connecticut Savings Bank, and the proceeds of this mortgage were used to retire the debt owed to DaPra. The exist-

[4] The purchase agreement was a preprinted form to which various changes had been made. Paragraph thirteen of the purchase agreement stated that "[t]he Seller agrees to deliver exclusive possession of the premises, as is . . . ." In paragraph thirteen, the preprinted words after the word "premises" had been crossed out on a typewriter and the words "as is" typed in above.

[5] The only other restriction in the warranty deed was a preprinted boilerplate clause stating that "[s]aid premises are subject to applicable Zoning and Planning Laws and Regulations, and to any municipal and sewer taxes payable after the date hereof."

ing purchase money mortgage was made expressly subordinate to the new Connecticut Savings Bank mortgage by a contemporaneously executed subordination agreement between the plaintiff and the defendants. As a condition of the approval of the Connecticut Savings Bank mortgage, the bank required Lowman and Beckmann to remove the underground gasoline storage tanks from the property. Removal of the tanks was effectuated in April, 1987. Upon removal of the tanks, an odor of gasoline was detected and, as a consequence, the DEP was notified of the potential environmental problem. Subsequent tests revealed soil contamination but the contaminated soil was apparently never removed.

Although the property's environmental problems were not discovered until the removal of the gasoline tanks in April, 1987, Lowman and Beckmann had stopped making payments on the purchase money mortgage as of February 2, 1987. As a result of Lowman and Beckmann's default on their mortgage obligations, the plaintiff initiated a foreclosure action against all three defendants by complaint dated July 31, 1987. In its complaint, the plaintiff also sought a deficiency judgment. After the complaint was filed, but before the defendants had filed their answers, Lowman quitclaimed his interest in the property to Beckmann.

All three defendants filed almost identical special defenses and counterclaims, alleging that the plaintiff had failed to comply with certain environmental disclosure and reporting obligations as required by the underground tank regulations promulgated by the commissioner of environmental protection pursuant to authority granted by General Statutes § 22a-449 (d) (underground tank statute).[6] The defendants fur-

---

[6] General Statutes § 22a-449 (d) provides in relevant part: "The commissioner of environmental protection in consultation with the commissioner

ther alleged that due to the environmental problems, the plaintiff breached the warranties contained in the warranty deed because the premises were not marketable and were encumbererd by an environmental lien by virtue of General Statutes § 22a-452a.[7] The defendants claimed that they would not have purchased the premises under the same terms and conditions had they known of the "true status of the title," or had they known of the plaintiff's failure to comply with the underground tank regulations. The three defendants, by essentially identical counterclaims, sought damages because of the alleged noncompliance with the underground tank regulations and the alleged breach of warranties in the plaintiff's warranty deed to Aydagul and Lowman.

The case was referred to an attorney trial referee who heard evidence for four days between June 14 and September 23, 1988. The hearing encompassed testimony from eleven witnesses and included nearly fifty exhibits. On July 25, 1989, the attorney trial referee issued a fourteen page report expounding his findings and recommendations. The report noted that, "[d]espite the extensive factual record, very few contested issues were raised." The attorney trial referee determined that all parties knew of the property's past use as a gasoline station and of the existence of the underground

of public safety may establish by regulations adopted in accordance with the provisions of chapter 54 standards and criteria for the nonresidential underground storage of oil, petroleum and chemical liquids . . . ."

[7] The original answer alleged that the premises were "encumbered pursuant to [General Statutes §] 22a-45a." No such section existed in the statutes, however, and the parties refer to § 22a-452a in their briefs. Section 22a-452a provides in relevant part that "[o]n and after June 3, 1985, any amount paid by the commissioner of environmental protection . . . to contain and remove or mitigate the effects of a spill shall be a lien against the real estate on which the spill occurred or from which it emanated in accordance with the provisions of this section . . . ." There is no evidence that the DEP has expended any money to rectify the environmental problems associated with the property involved in this case.

storage tanks at the time of the original transfer, and that no environmental liens had been placed on the property. The attorney trial referee also found Beckmann to be in default under the terms of the note held by the plaintiff and found Beckmann's conduct to be "as consistent with a debtor unable to pay as it is with one seriously concerned with the environmental problems facing the property."

On the basis of these findings of fact, the attorney trial referee concluded that (1) Aydagul and Lowman agreed to purchase the property "as is" and that the special defenses and counterclaims raised by the defendants were extinguished by the warranty deed, (2) Beckmann could not raise defenses related to the failure of the plaintiff to file certain environmental reports because of his lack of privity with the plaintiff, and also because the covenant against such encumbrances is personal in nature and does not run with the land, and Beckmann lacked privity with the plaintiff, (3) title to the property was not unmarketable, and (4) the plaintiff, pursuant to its rights under the note and mortgage, was entitled to foreclose on the property. The attorney trial referee therefore recommended "that a judgment of foreclosure be entered into against the defendants in accordance with this report."

Following issuance of the attorney trial referee's report, the defendants moved to correct the report and objected to the acceptance of the report. On April 5, 1990, the trial court issued a memorandum of decision remanding the case to the attorney trial referee for further analysis of the defendants' alleged defense that the plaintiff knowingly failed to comply with the reporting requirements of § 22a-449 (d)-1 of the underground tank regulations.

The plaintiff, by letter dated February 21, 1991, requested that the trial court expedite the conclusion

of the case, complaining that it had been attempting to foreclose on the mortgage for more than three years. On March 1, 1991, the defendants moved for a mistrial and revocation of reference, claiming that "it would be impossible for any finder of fact to make reasonable and proper determinations as to the credibility of witnesses, their demeanor and other factual concerns" because testimony was last heard by the attorney trial referee on September 23, 1988, almost two and one-half years prior to the motion. On March 19, 1991, before the court acted on the defendants' motion, the attorney trial referee filed his supplemental report.

The attorney trial referee's supplemental report stated that the issue to be decided "is whether the admitted noncompliance with [underground tank regulation § 22a-449 (d)-1] presents a defendant with any viable defense to the foreclosure or a viable counterclaim for some or all of the cost of any environmental clean-up." The attorney trial referee answered this in the negative, stating that "after a full review of the supplemental memoranda and the applicable law, the undersigned remains convinced that the plaintiff's noncompliance with this regulation is not a valid defense to the present foreclosure action and does not give rise to the private right of action that the defendants' counterclaim seeks. . . . It seems clear from the construction of the statute and regulations that this regulation was not intended to be utilized as a defense or remedy by private parties claiming technical violations of the statute."

The attorney trial referee's findings of fact, conclusions and recommendations were accepted by the trial court. The plaintiff thereupon filed a motion for a judgment of strict foreclosure, which was granted on February 10, 1992. The defendants appeal from the judgment for the plaintiff on the counterclaims, and from the judgment of strict foreclosure.

I

Before deciding the merits of the case, we must first address the defendants' argument that the excessive delay between the conclusion of testimony and the issuance of a report by the attorney trial referee, and the subsequent delay between the trial court's remand and the issuance of the attorney trial referee's supplemental report mandate that the reports be revoked or a mistrial declared.[8] In support of their position, the defendants urge this court to apply the so called "120 day rule," set forth in General Statutes § 51-183b[9] to attorney trial referees by judicial fiat, notwithstanding our express holding to the contrary in *Kupstis* v. *Michaud,* 20 Conn. App. 425, 567 A.2d 1253 (1989), appeal dismissed, 215 Conn. 435, 576 A.2d 152 (1990), and *Kowalsky Properties, Inc.* v. *Sherwin-Williams Co.,* 7 Conn. App. 136, 507 A.2d 43 (1986). Alternatively, the defendants argue that Practice Book § 430A,[10] which

---

[8] The trial court never specifically ruled on this issue, as it never made a ruling on the defendants' motion for mistrial and revocation of reference that was filed on March 19, 1992, or on their objections to the acceptance of the report of the attorney trial referee or their exceptions to the factual findings of the attorney trial referee, both filed April 1, 1991. The court did, however, impliedly deny the defendants' request by accepting the findings, conclusions and recommendations of the attorney trial referee in its October 9, 1991 memorandum of decision, wherein it stated: "I find no material error in the recommendations, or any other reason why the report is unacceptable." Moreover, the defendants sufficiently pursued this issue with the trial court by not only making the initial motion for a mistrial and revocation of reference, but by also including it in their subsequent objections and exceptions to the report. We conclude, therefore, that this claim was properly preserved for our review.

[9] General Statutes § 51-183b provides: "Any judge of the superior court and any state trial referee who has the power to render judgment, who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. The parties may waive the provisions of this section."

[10] Practice Book § 430A provides: "An attorney trial referee to whom a case has been referred shall file a report with the clerk of the court, with

became effective October 1, 1990, and expressly makes the 120 day rule applicable to attorney trial referees, should be given retroactive effect so as to apply to this case. We conclude that the 120 day rule now applicable to the reports of an attorney trial referee should not apply in this case.

General Statutes § 51-183b requires that any trial judge or state trial referee who has the power to render judgment must do so within 120 days from the completion of the trial. Both this court and our Supreme Court have refused to apply this statute to attorney trial referees by judicial construction, instead calling for a change in the appropriate provisions of the rules of practice. See *Kupstis* v. *Michaud,* supra, 215 Conn. 437. The rules of practice were subsequently amended by the addition of § 430A, which expressly makes the 120 day rule applicable to attorney trial referees.

Practice Book § 430A did not become effective until well after the original report of the attorney trial referee in this case was issued. Section 430A was also not yet in effect at the time the case was remanded to the attorney trial referee for supplemental findings, although it did become effective prior to the issuance of the supplemental report. On the basis of this sequence of events, the defendants urge that § 430A should be given retroactive effect so as to invalidate either the original report or its supplement. This argument has previously been raised and rejected in *New Canaan Bank & Trust Co.* v. *Cerretani,* 26 Conn. App. 929, 600 A.2d 332 (1991) (per curiam).

In *New Canaan Bank & Trust Co.,* the attorney trial referee's report was filed on October 3, 1990, more than 120 days after the completion of the trial and two days after Practice Book § 430A became effective. The trial

sufficient copies for all counsel, within one hundred and twenty days of the completion of the hearing before such referee."

court held that the 120 day rule was substantive in nature, and thus should not be given retroactive effect. The trial court, therefore, rejected the defendant's claim that it lacked personal jurisdiction because the report was untimely, and concluded that § 430A applies only to trials completed after the rule's effective date. We subsequently affirmed the decision of the trial court in that case and similarly affirm the decision of the trial court in this case.

## II

The principal basis for the defendants' appeal is that the plaintiff's purported nondisclosure of the environmental problems associated with the property may be asserted by the defendants as either a defense to the foreclosure action, or as a counterclaim for damages.[11] The foundation of this argument is that the provisions of the underground tank statute and its attendant regulations require a seller of real property to disclose the existence of certain environmental problems associated with the property to prospective purchasers and also report those problems to the DEP. Specifically, the defendants claim that § 22a-449 (d)-1 (f) of the regulations was violated, and that such violation provides

---

[11] In this foreclosure action, it is important to note that the complaint and counterclaim relate to a purchase money mortgage and therefore Practice Book § 116 is satisfied. See Practice Book § 116 ("[i]n any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint"). In view of our disposition of this case, it is unnecessary to address the allegations made in the defendants' special defenses. It is apparent, however, that the special defenses do not comply with Practice Book § 164 because they do not assert that the plaintiff has no cause of action for the foreclosure of its mortgage. See Practice Book § 164 ("No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that he has no cause of action, must be specially alleged").

them with a right of action. The defendants do not rely on General Statutes § 22a-134b.[12] See Practice Book § 109A (a). We conclude that the plaintiff had no duty of disclosure to the defendants under the cited regulations, and that the defendants may not successfully assert a counterclaim based on the failure of the plaintiff to make the disclosures to the DEP required by the regulation.

The plaintiff argues that it was not required to make any disclosures to the defendants pursuant to the act or regulations relating to the underground storage tanks because the property constituted either an "abandoned facility" or a "temporarily out-of-service facility" under the regulations. See *Diamond* v. *Marcinek,* 27 Conn. App. 353, 606 A.2d 1001, cert. granted, 223 Conn. 910, 612 A.2d 55 (1992).[13] The plaintiff does concede that irrespective of the property's status under the regulations, it was still required to provide notice to the DEP under § 22a-449 (d)-1 (d) of the regulations[14] and that it failed to do so. The plaintiff argues, however, that no private right of action, either express or implied, exists under the act or regulations for failure to comply with this notice provision, and, thus, its failure to make the required disclosures to the DEP cannot

[12] The trial court agreed with the attorney trial referee that a private cause of action does not exist for a violation of § 22a-449 (d)-1 (f) of the regulations, but that such a private right of action does exist under General Statutes § 22a-134b.

[13] The petition for certification was limited to the following question: "In the circumstances of this case, was the plaintiff entitled to rescission and restitution relating to rescission because of the defendants' failure to disclose the existence of a service station in violation of General Statutes §§ 22a-134 or 22a-134a or applicable administrative regulations?" *Diamond* v. *Marcinek,* 223 Conn. 910, 612 A.2d 55 (1992). It is therefore not applicable to the present case.

[14] Section 22a-449 (d)-1 (d) (4) of the Regulations of Connecticut State Agencies provides: "By May 8, 1986, the owner or operator of an abandoned or temporarily out-of-service facility shall notify the commissioner of the location, type and capacity of such facility and the date it was abandoned or removed from service."

be asserted by the defendants as a counterclaim. The plaintiff further alleges that, even if Lowman and Aydagul could assert a counterclaim against it due to its failure to make disclosures to the DEP, Beckmann certainly could not assert such a claim as he acquired his interest from Lowman and Aydagul.[15]

## A

The first question to be determined is whether the plaintiff had any duty of disclosure to the defendants under the provisions of the underground tank regulations.[16] Section 22a-449 (d)-1 (f) of the regulations specifically requires that an owner or operator of "any new or existing facility" who wants to transfer ownership, possession or control of that facility must disclose certain information to the transferee. The terms "new facility" and "existing facility" are defined in § 22a-449 (d)-1 (a). An "existing facility" is defined as "a facility the construction or installation of which began prior to the effective date of the regulations," while a "new facility" is defined as "a facility the construction or installation of which begins on or after the effective date of these regualtions . . . ." The effective date of the regulations is November 1, 1985. It is undisputed that the property had been used as a gasoline station sometime prior to November 1, 1985. The regulations also refer to "temporarily out-of-service" facilities and to "abandoned" facilities. A "temporarily out-of-service"

[15] The plaintiff also notes that neither Aydagul nor Lowman complied with the notice requirements that they seek to impose on the plaintiff when they transferred their interest to Beckmann.

[16] Even though the plaintiff asserts that notice to the purchasers was not required under the regulations, the plaintiff points out that such notice was given to the purchasers at the time of closing. At the closing, the plaintiff gave the purchasers an affidavit that stated: "The said premises were last used as a gasoline, automobile repair and service station on October 30, 1985, and gasoline was last pumped from the premises on said date. This Affidavit is made to induce Al Aydagul and George D. Lowman to purchase the said premises and with knowledge that they will rely herein."

facility is one "not in use, in that no regular filling or drawing is occurring; or not established and maintained in accordance with these regulations; or not regularly attended and secured," while an "abandoned" facility is one "rendered permanently unfit for use." Regs., Conn. State Agencies § 22a-449 (d)-1 (a).

The definitions of new and existing facilities are concerned with whether their construction or installation *began* after or before the effective date of the regulations. These definitions are silent as to whether the facility need remain in use after the installation or construction began. The words "began" and "begins" in the definitions, coupled with that silence, imply that the use of the facility continues. In contrast to new or existing facilities, temporarily out of service facilities and abandoned facilities refer to facilities that are no longer functional. If the definition of existing facility is read to mean any facility where construction or installation began before the date of the regulations, without regard to whether it is presently in use, there is an Alice in Wonderland result. If the definition of an existing facility is not read to mean a facility still in service, an existing facility could mean a facility that is no longer functional or in existence.

The facility in this case falls within the definition of a temporarily out of service facility. It was not in use at the time of the transfer to the defendants, it was not established *and* maintained in accordance with the regulations because its use as a facility had ended before the regulations were effective, and it was not regularly attended and secured.[17] The classification of facilities as new or existing or as temporarily out of

---

[17] Although we conclude that the facility is a temporarily out of service facility, it might also have been classified as an abandoned facility because the removal of the gas pumps may have rendered the facility permanently unfit for use.

service creates different obligations. An ongoing use of a new or existing facility, whether it began before or after the effective date of the regulations, requires certain disclosures to a transferee under § 22a-449 (d)-1 (f), whereas the temporarily out of service or abandoned facilities requires disclosure of certain information to only the commissioner of the DEP.

At the time of the initial transfer of the property from the plaintiff to Lowman and Aydagul in June, 1986, the property fell within the definition of a temporarily out of service facility.[18] Because the property here constitutes a temporarily out of service facility under the regulations, any transferor is required to notify only the commissioner of the DEP as to the existence of the facility and notification to the transferee is not required under § 22a-449 (d)-1 (d) (4). Section 22a-449 (d)-1 (f) does not apply. Thus, the plaintiff was not required under the regulations to make any disclosure to either Lowman or Aydagul upon transfer of the property.[19]

## B

Although the plaintiff owed no duty of disclosure to the defendants, it was required, under the express language of § 22a-449 (d)-1 (d) (4), to "notify the commissioner of the location, type and capacity of such facility and the date it was abandoned or removed from service." This the plaintiff admittedly did not do. The defendants claim that the plaintiff's failure to give such notice may be asserted as a defense in a foreclosure

---

[18] Although *Diamond* v. *Marcinek*, 27 Conn. App. 353, 360–61, 606 A.2d 1001, cert. granted, 223 Conn. 910, 616 A.2d 55 (1992), states that, on the facts of the case, the facility in question may be technically classified as an existing facility, it holds that the facility is an abandoned or temporarily out of service facility.

[19] Obviously, if the plaintiff owed no duty of disclosure to either Lowman or Aydagul, who were in direct privity of contract with it, the plaintiff owed no duty of disclosure to Beckmann, with whom it had no privity.

action,[20] and also in a separate counterclaim for damages arising from the nondisclosure. We conclude that a private right of action does not exist under the regulations for the failure to make disclosures to the DEP as required under § 22a-449 (d)-1 (d) (4).

The express language of § 22a-449 (d)-1 (d) (4) requires the owner or operator of any abandoned or temporarily out of service facility to notify state officials of the existence of such facility's location, type and capacity. The purpose of this requirement is to alert state officials to the existence of these facilities so that they may be monitored by the state, as trustee of the environment. General Statutes §§ 22a-1a, 22a-15. Neither § 22a-449 (d)-1 (d) nor any other provision of the act or regulations expressly provides that a private party may assert a cause of action or seek damages based on another's failure to provide notice to the DEP as required by § 22a-449 (d)-1 (d). In fact, the act and regulations do not provide for enforcement of the reporting requirements by the DEP or the state itself. Compare General Statutes § 22a-451 (a) (providing that upon request of the commissioner, the attorney general shall bring a civil action against any person, firm or corporation that directly or indirectly causes pollution and contamination of any land or waters of the state). Any right of action that the defendants might assert must therefore necessarily be implied from the regulations or the act itself. In order to ascertain whether the legislature intended to create such an implied right of action under § 22a-449 (d)-1 (d), we must look to other similar provisions of the act and its regulations.

We begin by observing that in General Statutes § 22a-134b,[21] the legislature specifically provided for

---

[20] See footnote 11, supra.

[21] General Statutes § 22a-134b provides in its entirety: "DAMAGES. Failure of the transferor to comply with any of the provisions of sections 22a-134

the recovery of damages by the transferee of property used as a "service station" from the transferor if the transferor failed to comply with the reporting requirements of General Statutes § 22a-134a. Thus, when the legislature intended to create a private right of action it did so, and it did so expressly. See, e.g., General Statutes § 22a-16 ("any person . . . may maintain an action . . . for declaratory and equitable relief against . . . any person . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction"); General Statutes § 22a-452 ("[a]ny person . . . which contains or removes or otherwise mitigates the effects of . . . hazardous wastes . . . shall be entitled to reimbursement from any person . . . for the reasonable costs expended for such containment, removal, or mitigation, if such . . . pollution or contamination . . . . resulted from the negligence or other actions of such person"); see also *Connecticut Water Co.* v. *Beausoleil,* 204 Conn. 38, 44, 526 A.2d 1329 (1987) (holding that the Environmental Protection Act, General Statutes §§ 22a-14 through 22a-20, authorizes injunctive or declaratory relief but does not authorize a private claim for damages). The legislature could have provided for a private right of action under the underground tank act but chose not to do so. See *Middletown* v. *Hartford Electric Light Co.,* 192 Conn. 591, 596, 473 A.2d 787 (1984) ("[w]hen the legislature has authorized supplementary private causes of action, it has generally done so expressly").

Additionally, General Statutes § 22a-438 (a) provides that any person who violates any provision of chapter 446k of the General Statutes, which includes § 22a-449 (d),

---

to 22a-134d, inclusive, entitles the transferee to recover damages from the transferor, and renders the transferor of the establishment strictly liable, without regard to fault, for all cleanup and removal costs and for all direct and indirect damages."

shall be assessed a civil penalty not to exceed $25,000. Such penalty is to be recovered through means of a civil action instituted by the attorney general upon request of the commissioner of the DEP. The right to maintain a private right of action is conspicuously absent from this provision.

We conclude that the regulations do not create an implied right of action for their violation, and thus no private right of action may be asserted by a transferee against a transferor for the transferor's failure to make disclosures to the DEP as required by § 22a-449 (d)-1 (d).

### III

The defendants next claim that because of the property's environmental problems, the plaintiff breached the warranties in the warranty deed given by the plaintiff to Lowman and Aydagul, thus conveying unmarketable title. Specifically, the defendants claim that "[m]arketable title was not conveyed herein because the environmental problems and contamination of the site precluded the property from being mortgaged and, indeed, precluded the property from being sold at a fair price to reasonable purchasers." We find that although the subject property may be difficult to mortgage or sell, such difficulty arises from the physical condition of the property and not from a defect in the chain of title. The plaintiff did not breach any of the warranties of *title* contained in the warranty deed and thus the property's *title* is not unmarketable.

As the defendants correctly point out, "[a] marketable title is one that can be sold 'at a fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as a security for the loan of money.' " *Frank Towers Corporation* v. *Laviana,* 140 Conn. 45, 52, 97 A.2d 567 (1953), quoting *Perkins* v. *August,* 109 Conn. 452, 456, 146 A. 831 (1929); see also *Frimberger* v. *Anzellotti,* 25 Conn. App. 401, 408, 594

A.2d 1029 (1991). "To render a title unmarketable, the defect must present a real and substantial probability of litigation or loss." *Frank Towers Corporation* v. *Laviana,* supra, 52–53. Undoubtedly, the property may be potentially difficult to sell or mortgage due to the environmental problems associated with it, but these problems do not impair the property's title. Difficulty in selling or mortgaging the property is a function of the lessening of its economic value by the potential cost of cleanup; it is not due to a defect in the property's chain of title.

The only effect on the property's title is the possibility that the state might file an environmental lien on the property pursuant to General Statutes § 22a-452a[22] to ensure reimbursement of any money expended by the state in the operation of cleaning up the property. The state has yet to file such a lien, and the filing of such lien could be avoided by the prompt payment of any cleanup costs by the defendant. The environmental problems associated with the property do not violate any of the warranties of title contained in the warranty deed, and thus the plaintiff did not convey unmarketable title to Aydagul or Lowman.

---

[22] General Statutes § 22a-452a provides in pertinent part: "STATE LIEN AGAINST REAL ESTATE AS SECURITY FOR AMOUNTS PAID TO CLEAN UP HAZARDOUS WASTE. (a) On and after June 3, 1985, any amount paid by the commissioner of environmental protection . . . to contain and remove or mitigate the effects of a spill shall be a lien against the real estate on which the spill occurred or from which it emanated . . . .

"(b) A lien pursuant to this section shall not be effective unless (1) a certificate of lien is filed in the land records of each town in which the real estate is located . . . and (2) the commissioner mails a copy of the certificate to such persons and to all other persons of record holding an interest in such real estate over which the commissioner's lien is entitled to priority. . . .

"(c) Except as provided in subsection (a), such lien shall take precedence over all transfers and encumbrances recorded on or after June 3, 1985 . . . ."

Moreover, any breach of warranty claims arising out of the purchase and sale agreement, as opposed to claims arising out of the warranty deed, with respect to the condition of the property itself were negated by the "as is" clause of that agreement. The seventh numbered paragraph of the purchase and sale agreement states in its entirety: "The Purchaser has inspected said premises and is satisfied with the physical condition thereof and agrees to accept said premises in their present condition on an "as is" basis. Neither Seller nor his representatives has made any representations or warranties as to said premises on which Purchaser has relied other than as expressly set forth in this agreement." Additionally, the thirteenth numbered paragraph states in its entirety: "The Seller agrees to deliver exclusive possession of the premises, as is, and all keys to the Purchaser simultaneously with the closing of title provided for herein. Purchaser shall have the right to make a final inspection of the premises prior to the closing of title." In the original agreement, the preprinted words "broom clean" were crossed out and "as is" typed in.

The parties' intent with respect to the physical condition of the property and any warranties related to that condition is clear from the words of the agreement, and is further confirmed by the manual alteration made in paragraph thirteen. To hold now that the plaintiff in fact had made warranties to the buyers concerning the condition of the property, or that those warranties have been breached, would be fundamentally inconsistent with the clear and unambiguous wording of the cited provisions. The plaintiff disclosed to the purchasers that the property had previously been used as a gas station, and, in fact, the purchasers intended to use the property for an auto repair business. There is no evidence that the plaintiff knew, or should have

known, anything more than the purchasers about the existence of the underground storage tanks, or possible contamination therefrom.

It was the clear intent of the plaintiff to transfer, and the purchasers to accept, the property "as is" and without "any representations or warranties as to the premises . . . other than expressly set forth in [the purchase and sale] agreement." We conclude that the attorney trial referee's determination that the defendants were not entitled to damages, as adopted by the trial court, was correct.

The judgment of strict foreclosure is affirmed and the case is remanded with direction to set new law days. The judgment for the plaintiff on the defendants' counterclaims is affirmed.

In this opinion the other judges concurred.